UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEBRA J. HORNING,

      Plaintiff,

v.

COMMISSIONER OF
SOCIAL SECURITY,

      Defendant.

_____/

Case No. 5:14-cv-11723
Judge John Corbett O'Meara
Magistrate Judge Anthony P. Patti

**REPORT AND RECOMMENDATION REGARDING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 15) and DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DE 16)**

**I.     RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary

judgment, **GRANT** Defendant's motion for summary judgment, and **AFFIRM** the

Commissioner's decision.

**II.     REPORT**

      Plaintiff, Debra J. Horning, brings this action under 42 U.S.C. §§ 405(g) for

review of a final decision of the Commissioner of Social Security

("Commissioner") denying her application for disability insurance benefits (DIB).

This matter is before the United States Magistrate Judge for a Report and

Recommendation on Plaintiff's motion for summary judgment (DE 15), the

1

Commissioner's cross motion for summary judgment (DE 16), Plaintiff's reply

(DE 17) and the administrative record (DE 11).

### A.    Background

Plaintiff filed her application for DIB on May 24, 2011, alleging that she has

been disabled since December 29, 2008, at age 48.  R 194-200; *see also* R. at 218-

220, 221-231.  Plaintiff alleges disability as a result of migraine headaches,

lumbar-degenerative bone disease with pinched disc, diabetes with some

neuropathy, fibromyalgia, severe sleep apnea, and depression.  R. at 120-121.

Plaintiff's application was denied initially on October 17, 2011.  R. at 120-134,

135.[1]

On December 9, 2011, Plaintiff sought a *de novo* hearing before an

Administrative Law Judge ("ALJ").  R. at 82-83.  ALJ Paul W. Jones held a

hearing on October 2, 2012, at which Plaintiff and VE Sharon Princer appeared (R.

at 84-119).  On November 16, 2012, ALJ Jones issued an unfavorable decision,

concluding that Plaintiff had not been under a disability within the meaning of the

Social Security Act since December 29, 2008.  R. at 61-79.

---

[1] The SSA Disability Determination Explanation was issued on October 17, 2011.
R. at 120-134, R. at 135.  Quan Nguyen, M.D., assessed Plaintiff's physical RFC.
R. at 128-130.  Blaine Pinaire, Ph.D. assessed Plaintiff's mental RFC (R. at 130-
132), as well as her medically determinable impairments and severity (R. at 126-
127).

On or about January 15, 2013, Plaintiff requested review of the unfavorable decision.  R. at 59.  On March 11, 2014, the Appeals Council denied Plaintiff's request for review.  R. at 1-6.  Thus, ALJ Jones's decision became the Commissioner's final decision.

Plaintiff then timely commenced the instant action on April 30, 2014.  DE 1.

### B.    Plaintiff's Medical History

Plaintiff alleges that she has been disabled since December 29, 2008.  R. at 28.  Plaintiff's medical records span the period from April 22, 2008 to January 7, 2013.  R. at 261-736 (Exhibits 1F-21F).  Among those the ALJ cited are:

- November 10, 2009 radiology examination (R. at 289)
- October 23, 2010 radiology examinations (R. at 310-312)
- February 23, 2011 consultation with Deidre Redd, M.D. of Allegiance Physical Medicine and Rehabilitation (R. at 464-466; *see also* R. at 393-395)
- March 17, 2011 records of Allegiance Health Memorial Hospital, Inc. (R. at 515-522)
- March 2011 records of Allegiance Health (R. at 327-388)
- April 4, 2011 notes of Syed Hasan Raza, M.D. of Allegiance Rheumatology (R. at 405-408)
- April 8, 2011 letter of Michelle Reicosky Brewer, D.O. (R. at 467-472)
- April 20, 2011 Medical Examination Report of Andrea Breese, M.D. (R. at 389-390)
- May 3, 2011 Medical Examination Report of Michelle Brewer (R. at 391-392)
- September 7, 2011-September 15, 2011 records of Allegiance Crisis Residential Program (R. at 484-493, 494-514)
- September 22, 2011 letter from Eric Mikelait (R. at 588)
- September 22, 2011 records of Walid Nader, M.D. of HCC Evaluations, L.L.C. (R. at 589-595)

- October 6, 2011 assessment of John D. Jeter, M.A., L.L.P., L.L.M.S.W. and Hugh Bray, Ph.D., L.P. (R. at 596-601)[2]
- July 2012 records of Waseem Ullah, M.D. (R. at 624-626)
- September 27, 2012 letter from Eric Mikelait, L.M.S.W. (R. at 628)

R. at 70-73.  These records will be discussed in detail as required below.

### C.    Hearing Testimony

#### 1.    Plaintiff's Testimony

Plaintiff testified at the October 2, 2012 hearing.  R. at 89-106, 110-117. She has a high school diploma plus two years of college, where she achieved an Administrative Associate's degree.  R. at 93-94.  She knows how to read and write and do simple math.  R. at 94.  She has county assistance for health care and receives food stamps in the amount of $200 per month.  R. at 95.

When her job with Michigan Bell Telephone Company ended in 2004, she got a year of severance and, after that, a year of unemployment.  R. at 96, 100.  She was laid off from a job she had in 2008 at Schiffer Mason, after which she thinks she got some unemployment during 2009.  R. at 96.

Although she has lived alone since 2008, her 21 year old daughter moved in during 2012 to help Plaintiff.  R. at 90.  Also living with Plaintiff are her daughter's 24 year old boyfriend and their 22 month old baby.  R. at 90-91.  They pay some rent, if possible.  *See* R. at 90, 95.

---

[2] The ALJ gave great weight to the October 6, 2011 consultative examination of John D. Jeter, M.A., L.L.P., L.L.M.S.W., and Hugh Bray, Ph.D., L.P. (R. at 596-601).  R. at 71.

4

From 2008 to 2012, if she needed something done at the house, she would call for help or hire someone to get it done.  She has done laundry when she can but has not done much in 2012.  R. at 91-92.  Plaintiff grocery shops in small spurts, but she has to lean on the cart and needs assistance to unload canned goods, etc.  She drives only short distances, due to twitches in her leg.  R. at 92.

Plaintiff has trouble getting ready for doctor's appointments due to pain.  R. at 110.  Plaintiff takes Ultram®, Mobic® and/or Tylenol for back and hip pain.  R. at 103.  Her hips are worse than her low back.  R. at 103-104.  She admitted to smoking marijuana to help relax spasms and to help her sleep.  R. at 104.

Upon examination by her counsel, Plaintiff testified about the daily effects of her depression.  R. at 110.  She also testified that, in addition to Cymbalta®, she takes Neurontin, Zestoretic®, Glucophage, Mobic®, Benadryl®; and Bentyl and described the side effects of these medications.  R. at 113-114.  She further testified to functional limitations, such as sitting, standing, lifting and showering, as well as her limitation in concentration.  R. at 114-115, 116.

The ALJ's re-examination of Plaintiff included testimony about the physical and mental challenges she faces when getting ready for an appointment (R. at 110-111) and that she either lays on the couch or watches television, mostly The Waltons, from her Lazy Boy all day, since she cannot stand or sit (R. at 117).  She also testified about her fibromyalgia and the diaphoretic side effects caused by

5

several increases in her dosage of Cymbalta®, of which she was unaware.  R. at 111-113.

### 2.    Vocational Expert Testimony

Vocational Expert (VE) Sharon K. Princer also testified at the October 2, 2012 hearing.  When examined by the ALJ, VE Princer testified that Plaintiff's past relevant work as a telephone operator and information operator at Michigan Bell were "semi-skilled, sedentary, SVP 3, performed at sedentary[,]" and the receptionist job at Schiffer Mason Contractor was "SVP 4, semi-skilled, sedentary, performed at medium."  R. at 106-107.  After being posed with an extensive hypothetical, the VE testified that such a person could perform the light, unskilled jobs of hand packer, inspector and assembler, and which exist in significant numbers in the local economy.  R. at 108-109.

However, when examined by Plaintiff's counsel and asked to assume Plaintiff's testimony regarding her limitations, VE Princer testified that Plaintiff would not be able to perform the job duties.  R. at 117-118.

### D.    The Administrative Decision[3]

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

    1.    Is the claimant engaged in substantial gainful activity?

6

ALJ Paul W. Jones rendered his decision on November 16, 2012.  R. at 61-79.  At Step 1, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 29, 2008, the alleged onset date.  R. at 66.

At Step 2, the ALJ found that Plaintiff had the severe impairments of: obesity; hip, degenerative joint disease and arthritis; anxiety disorder; and affective disorder.  R. at 66-68.  The ALJ further determined that Plaintiff's lumbago condition, diabetes, hypertension, fibromyalgia and marijuana abuse could not be considered severe impairments.  R. at 67-68.

At Step 3, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  R. at 68-69.

---

2.      Does the claimant suffer from one or more severe impairments?
3.      Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.      Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

At Step 4, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform light work with certain exceptions and that Plaintiff could not perform any past relevant work.  R. at 69-73.

At Step 5, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform.  R. at 74.

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide

questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant."). Furthermore, the claimant "has the ultimate burden to establish an entitlement to benefits by proving the existence of a disability." *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or

deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

**F.     Analysis**

In her motion for summary judgment, Plaintiff contends that the ALJ did not comply with the Social Security Rules and Regulations when assessing her ability to perform full time competitive work (DE 15 at 22-27) and also contends that the ALJ failed to comply with 20 C.F.R. § 404.1527 and SSR 06-03p in not according adequate weight to the opinion of Plaintiff's treating mental health therapist (DE 15 at 27-30).

The Commissioner opposes Plaintiff's motion, asserting that the ALJ properly assessed Plaintiff's ability to perform full-time competitive employment (DE 16 at 9-21) and the ALJ properly evaluated the opinion from Plaintiff's mental health therapist (DE 16 at 21-26).

The Undersigned will address these arguments in turn.

**1.     Plaintiff's ability to perform full-time competitive work**

**a.     Obesity[4] and Obstructive Sleep Apnea (OSA)[5]**

---

[4] Obesity is "[a]n excess of subcutaneous fat in proportion to lean body mass." Stedmans Medical Dictionary 620200.

[5] Sleep apnea syndrome is "a disorder characterized by multiple episodes of partial or complete cessation of respiration during sleep." Stedmans Medical Dictionary 882120.

Plaintiff claims that the ALJ did not assess the impact of her obesity and OSA.  DE 15 at 22-23.  Plaintiff contends that, while the ALJ determined that Plaintiff had the severe impairment of obesity, the ALJ did not analyze the effects of obesity as required by SSR 02-1p in determining Plaintiff's RFC.[6]  According to Plaintiff, her pain is explained by her level III obesity.  Referring to SSR 96-7p,[7] Plaintiff suggests that the ALJ should have believed Plaintiff's testimony about her limitations "in spite of her long and good work record . . . ."  DE 15 at 23.

In support of her statement that "[t]he ALJ's recitation of his knowledge that Plaintiff is severely impaired by obesity does not replace a carefully analyzed opinion as to how this very severe impairment effects plaintiff's ability to perform substantial gainful employment[,]" DE 15 at 23, Plaintiff relies upon *Sleight v. Commissioner of Social Sec.*, 896 F.Supp.2d 622, 630-636 (E.D. Mich. 2012) (Cohn, J., adopting report and recommendation of Michelson, M.J.).  DE 15 at 23-24.  However, as the Commissioner points out (DE 16 at 11-12), *Sleight* is

---

[6] SSR 02-1p states, in part, that "[t]he effects of obesity may not be obvious. For example, some people with obesity also have sleep apnea. This can lead to drowsiness and lack of mental clarity during the day. Obesity may also affect an individual's social functioning."  It further states, "[i]n cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea."  SSR 02-1p.

[7] "An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."  SSR 96-7p.

factually and procedurally distinguishable.  In *Sleight*, the Court remanded at Step 3, after noting the ALJ's finding that Sleight had the severe impairments of low back pain, migraine headaches and bipolar disorder, *but not obesity*.[8]  The plaintiff in *Sleight* weighed 484 pounds, more than double the weight of the Plaintiff here.  By contrast, in the instant matter, Plaintiff testified that she weighed 218 pounds (R. at 93) and the ALJ determined that Plaintiff's severe impairments *did include* obesity (R. at 66).  Finally, *Sleight* also turned upon an erroneous factual finding by the ALJ concerning that particular plaintiff's sleep apnea, which "may have caused him to erroneously discount Plaintiff's credibility[,]" *Sleight*, 896 F.Supp.2d at 635, unlike here.

More importantly, the ALJ's decision in the case at bar did consider Plaintiff's obesity at Steps 3 through 5.  Within the discussion of applicable law, the ALJ stated:

> It should be noted that I am aware that obesity often complicates existing medical problems and that any effects of this condition may not be readily apparent.  The combined effects of obesity with other impairments may be greater than might be expected without the disorder.  When evaluating claimant's obesity as a severe impairment, I have given consideration to all the foregoing factors during the

---

[8] "In sum, the ALJ's borderline non-compliance with S.S.R. 02–1p and the ALJ's erroneous finding of fact regarding Plaintiff's sleep apnea, *taken together*, warrant remanding this case for further explanation and/or fact finding. *Because this Court recommends remand at step three, Plaintiff's remaining arguments, which claim error in the ALJ's RFC and credibility assessments, and in the ALJ's weighing of evidence, are moot.*"  *Sleight*, 896 F.Supp.2d at 636 (emphasis added).

sequential evaluation at Step 3, Step 4, and Step 5, and has given consideration to [SSR] 02-1p, which supersedes [SSR] 00-3p.

R. at 65.  After determining that obesity was one of Plaintiff's severe impairments at Step 2, the ALJ noted within his RFC discussion that Plaintiff had received treatment for obesity.  R. at 66, 70.  This was obliging, considering that Plaintiff merely testified to her weight, not to any corresponding limitations.  R. at 93. Furthermore, while Plaintiff did mention that, *due to her inability to stand or sit,* she either reclines in her Lazy Boy or lays on the couch during the day and either watches TV or dozes "because I don't sleep at night" (R. at 117), and argues that OSA is "one of *the usual* comorbidities" associated with obesity (DE 17 at 3) (emphasis added), she fails to show the Court in either one of her briefs where the record supports a claim of debilitating apnea, let alone evidence of the limitations which are alleged to stem from her obesity and/or apnea. (*See* DE 15 at 22-24, DE 17 at 2-3).

Instead, it was *the ALJ* who cited reports of Plaintiff's obesity, which are found within his Step 4 RFC determination.  Although the ALJ relied upon various records in stating that Plaintiff had received treatment for obesity (*see* R. at 70, 261-326, 409-463, 470-477), the Undersigned particularly notes that the ALJ gave some weight to the October 7, 2011 physical RFC assessment of Quan Nguyen, M.D. (R. at 128-130), which listed obesity as one of the causes of Plaintiff's postural limitations (R. at  129) and which nevertheless noted that "the claimant

13

has capacity to perform a [sic] light work." R. at 71, 128-130. The ALJ also gave

some weight to the October 17, 2011 finding of Blaine Pinaire, Ph.D., which listed

obesity as a severe medically determinable impairment. R. at 71, 126.

Additionally, he considered the September 22, 2011 internist report of Walid

Nader, M.D. of HCC Evaluations, L.L.C., which notes that Plaintiff "has a

problem with [and history of] sleep apnea and uses a CPAP machine at home[,]"

and lists her weight as 223 pounds, as well as a neurological and orthopedic

supplemental report of the same date which mentions pain with squatting and

arising from squatting and concludes that clinical evidence supports the need for a

walking aid. R. at 72, 589-593.[9] Thus, the ALJ effectively considered Plaintiff's

obesity and apnea. *Coldiron v. Commissioner of Social Security*, 391 F.App'x 435,

443 (6th Cir. 2010) ("Given the ALJ's discussion of Coldiron's obesity throughout

his findings of fact and the ALJ's use of RFCs from physicians who explicitly

considered Coldiron's obesity, we find that the ALJ adequately accounted for the

effect that obesity has on Coldiron's ability to perform sedentary work."); *Bledsoe*

*v. Barnhart*, 165 F.App'x 408, 412 (6th Cir. 2006) ("The ALJ did consider

Bledsoe's obesity. First, the ALJ made explicit mention of Bledsoe's obesity in his

---

[9]While there is also cursory mention of "sleep apnea" in a October 4, 2012 Center
for Family Health record at R. 634, it only appears amongst a long list of "*Past*
Medical/Surgical History" (emphasis added).

14

finding of facts. Second, the ALJ does not need to make specific mention of obesity if he credits an expert's report that considers obesity.").

Plaintiff's argument that the Court "is left without any ability to review how [the ALJ] considered obesity and how he applied it to [Plaintiff's] RFC[,]" suggesting that the ALJ did not comply with 5 U.S.C. § 557(c)(3)(A), is not supported by the record.  The ALJ's consideration of both obesity and apnea was adequate.

Plaintiff also reminds the Court that, when examined by Plaintiff's counsel and asked to assume Plaintiff's testimony regarding her limitations, VE Princer testified that Plaintiff would not be able to perform the job duties (R. at 117-118). DE 17 at 3.  However, while Plaintiff may well suffer from OSA in association with her Level III obesity,[10] and while Plaintiff did testify about daytime sleepiness while reclining in a chair (R. at 117), the fact remains that the ALJ gave "some weight" to the assessments of Drs. Nguyen and Pinaire (*see* R. at 71, 126-127, 128-130, 130-132), as mentioned above.  Furthermore, even if Plaintiff's attempt to discount Dr. Nadar's opinion were successful, there is record evidence in the form

---

[10] "Obesity is an independent risk factor for hypertension, hypercholesterolemia, Type 2 diabetes mellitus, myocardial infarction, certain malignancies (cancer of the colon, rectum, and prostate in men and of the breast, cervix, endometrium, and ovary in women), *obstructive sleep apnea*, hypoventilation syndrome, osteoarthritis and other orthopedic disorders, infertility, lower extremity venous stasis disease, gastroesophageal reflux disease, and urinary stress incontinence." Stedmans Medical Dictionary 620200 (emphasis added).

15

of Dr. Nguyen's October 7, 2011 physical RFC finding, which mentioned obesity as *one cause* of the postural limitations (R. at 128-130) and upon which the ALJ relied (R. at 71). Plaintiff's real argument here is not that the ALJ failed to consider the evidence of her obesity and/or apnea, but that he should have weighed it in her favor or given more heed to other evidence. This is an improper basis for reversal, and second-guessing by the Court on this basis runs afoul of the standard of review. *See Panetis v. Barnhart*, 95 F.App'x 454, 456 (3d Cir. 2004).[11]

### b.   Effects of lumbago[12]

Plaintiff claims the ALJ did not consider the effects of her lumbago. DE 15 at 24-25. More directly, Plaintiff challenges the ALJ's Step 2 conclusion that Plaintiff's lumbago was not a severe impairment (R. at 67). DE 15 at 24. "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." Soc. Sec. Rul. 96–3p, 1996 WL 374181 at * 1 (1996). In

---

[11] "On appeal, Panetis essentially argues that the ALJ weighed the evidence incorrectly, and that her evidence establishing a 1936 birthyear is more credible than evidence to the contrary. This is the precise type of second-guessing prohibited by the 'substantial evidence' standard of review. Under this standard, this Court can reverse only if it finds that the ALJ could not have reasonably read the evidence to favor a 1942 birthyear. Here, although Panetis has provided evidence that *could* lead a factfinder to conclude that she was born in 1936, her evidence does not render a 1942 birthyear an unreasonable conclusion." *Panetis*, 95 F.App'x at 456.

[12] Lumbago is "[p]ain in mid and lower back; a descriptive term not specifying cause." Stedmans Medical Dictionary 514330.

other words, "if an impairment has 'more than a minimal effect' on the claimant's ability to do basic work activities, the ALJ must treat it as 'severe.'" *Nejat v. Commissioner of Social Sec.*, 359 F.App'x 574, 576-577 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96–3p, 1996 WL 374181 at * 1 (1996)).

At Step 2, in concluding that Plaintiff's lumbago was not a severe impairment, the ALJ referred to several assessments including the notes of Stanley S. Lee, M.D., who diagnosed chronic low back pain (R. at 466-477) and the consultation report and notes of John J. Wald, M.D., from five separate visits.  R. at 67.[13]  Notably, Dr. Wald: wrote that Plaintiff's muscle pain was relieved by pain/prescription medications and her myalgia was stable (R. at 478, 481); assessed chronic sciatica but found no evidence of radiculopathy (R. at 602-606); noted no findings of active radiculopathy (R. at 610, 615) and noted no findings of neurologic disease or myopathy (R. at 622).  R. at 67.

In addition, the ALJ's Step 2 discussion regarding lumbago referred to an MRI, specifically the July 20, 2012 MRI of the lumbar spine, which revealed, among other things, degenerative disc disease and *mild* disc bulges (R. at 625-626). *See* R. at 67.  Moreover, the Court notes that Plaintiff's medical records include further evidence of such tests:

---

[13] *See* R. at 478-483 (May 3, 2011 [Ex. 6F]); R. at 602-606 (October 19, 2011 [Ex. 13F]); and R. at 607-623 (February 2, 2012, June 5, 2012, September 11, 2012 [Ex. 13F]).

- a November 5, 2004 whole body bone scan revealed "*[m]inimal* degenerative changes at the knees and ankles, but *no significant abnormality* at the hip joints[,]" R. at 443 (emphasis added);

- a April 22, 2008 lumbar spine test showed early degenerative disc disease (R. at 421);

- Plaintiff's September 24, 2009 MRI of lumbar spine revealed degenerative disc disease and disc bulges (R. at 285-286);

- a November 10, 2009 x-ray of hips with pelvis revealed "*[m]ild to moderate* degenerative arthritis involving hips bilaterally greater on the right side[,]" R. at 289 (emphasis added);

- October 23, 2010 MRI of lumbar spine and x-ray of hips with pelvis revealed disc degeneration, disc bulge and "*[m]ild to moderate* degenerative arthritic changes involving bilateral hips, greater on the right[,]" R. at 310-312 (emphasis added); and

- the July 12, 2012 x-ray of hips with pelvis, which revealed "*[m]ild to moderate* bilateral hip DJD, right greater than left without significant change since 11/10/2009[,]" R. at 624 (emphasis added).

It is Plaintiff's position that "multiple MRIs . . . prove conditions that would account for the pain." DE 15 at 25. However, a diagnosis of lumbago confirmed by an MRI does not necessarily confirm the severity of the lumbago. In *Higgs v. Bowen*, 880 F.2d 860 (6th Cir. 1988), the Sixth Circuit stated: "The mere diagnosis of arthritis, of course, says nothing about the *severity* of the condition." *Higgs,* 880 F.2d at 863 (emphasis added). The Court then noted, "[t]he doctors' reports are

18

silent regarding any limitation of joint motion, as well as the intensity, frequency, and duration of arthritic pain. We have upheld findings of no severe impairment in cases involving similar records." *Id*. The same is true here. Moreover, the record indicates that Plaintiff's pain is relieved by medication. R. at 67, 478.

To be sure, Plaintiff's reply attempts to make the case, by making several citations to the record, that the ALJ did not properly credit the intensity of her lumbago. *See* DE 17 at 3-5. However, the ALJ's Step 2 discussion of Plaintiff's lumbago was supported by Dr. Lee's September 30, 2009 notes (R. at 466-477), Dr. Wald's May 3, 2011 notes (R. at 478-483), Dr. Wald's October 19, 2011 notes (R. at 602-606), and Dr. Wald's February 2, 2012, June 5, 2012 and September 11, 2012 notes (R. at 607-623), as well as the July 20, 2012 MRI of the lumbar spine (R. at 625-626). Thus, the ALJ's finding that Plaintiff's lumbago was not a severe impairment is supported by substantial evidence.

Moreover, the ALJ mentioned back pain elsewhere in his decision. For example, at Step 4, the ALJ discussed the April 4, 2011 office visit with Syed Hasan Raza, M.D. (R 405-408), at which Plaintiff felt "some improvement in right hip and low back pain[;]" the May 3, 2011 notes of Michelle Brewer (R. at 391-392), which list low back pain and a diagnosis of fibromyalgia; and Dr. Nader's September 22, 2011 internist report (R. at 589-595), which note "lumbar degenerative bone disease with pinched disc," and "fibromyalgia" among

Plaintiff's complaints and indicate that the musculoskeletal examination revealed "mild pain with pressure to the lumbar area." *See* R. at 72. It is clear that he took all of this into consideration in rendering his opinion.

Thus, even if the ALJ erred by not concluding that Plaintiff's lumbago was a severe impairment, the ALJ took lumbago into consideration at Step 4. *See Nejat v. Commissioner of Social Sec.*, 359 F.App'x 574, 577 (6th Cir. 2009) ("even if the ALJ erred at step two, the ALJ's consideration of the cumulative effect of Nejat's impairments (both severe and non-severe) throughout the remaining steps of the analysis rendered any error harmless.") (citing *Maziarz v. Sec'y of Health & Human Servs.,* 837 F.2d 240, 244 (6th Cir.1987)). In other words, any error in the ALJ's treatment of Plaintiff's lumbago at Step 2 was rendered harmless by the ALJ's treatment of Plaintiff's lumbago during the determination of Plaintiff's RFC.

### c.   Effects of Fibromyalgia Syndrome (FMS)[14]

Plaintiff claims the ALJ did not consider the effects of her fibromyalgia syndrome. DE 15 at 25-26. In essence, Plaintiff challenges the ALJ's Step 2 conclusion that Plaintiff's fibromyalgia is not a severe impairment. DE 15 at 25, R. at 68.

---

[14] Fibromyalgia is "[a] common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances; the cause is unknown." Stedmans Medical Dictionary 331870.

20

The Social Security Ruling that concerns the evaluation of fibromyalgia provides, in part: "Generally, a person can establish that he or she has an MDI of FM by providing evidence from an acceptable medical source. A licensed physician (a medical or osteopathic doctor) is the only acceptable medical source who can provide such evidence. We cannot rely upon the physician's diagnosis alone. The evidence must document that the physician reviewed the person's medical history and conducted a physical exam. We will review the physician's treatment notes to see if they are consistent with the diagnosis of FM, determine whether the person's symptoms have improved, worsened, or remained stable over time, and establish the physician's assessment over time of the person's physical strength and functional abilities." SSR 12-2P, 2012 WL 3104869, 2 (July 25, 2012) (footnote omitted).

In concluding that Plaintiff's fibromyalgia was not a severe impairment, the ALJ relied upon Plaintiff's October 2, 2012 testimony (R. at 84-119) and the May 3, 2011 consultation by Dr. Wald (R. at 478-483). Then, the ALJ specifically stated: "As there are no medical evidence records demonstrating a severe fibromyalgia condition or indicating that the condition caused work related or functional limitations for the requisite 12-month period, this condition cannot be considered a severe impairment." R. at 68.

To be sure, Plaintiff backs up her argument that the ALJ did not consider the effects of her FMS with citations to her testimony about housework (R. at 91), and the April 22, 2008 notes of rheumatologist Sonia Yousuf, M.D. (R. at 460-463), as well as references to the notes of rheumatologist Syed Hasan Raza, M.D.  DE 15 at 25.  Plaintiff takes the position that the ALJ should have analyzed the symptoms listed in Yousuf's and Raza's notes for their effects on Plaintiff's RFC.  DE 15 at 25-26.  Then, relying in part upon *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 245 (6th Cir. 2007), Plaintiff contends that the ALJ "erroneously concentrated on an analysis of how Ms. Horning's pain complaints were not supported by objective medical evidence ([R. at 68]) – which just proves FMS, it does not disprove it."  DE 15 at 26.  Similarly, in her reply, Plaintiff  takes the position that SSR 99-2p, which concerns evaluating chronic fatigue syndrome (CFS) cases, requires more than ALJ Jones provided.  DE 17 at 5-6.  In so doing, Plaintiff notes that Dr. Nader's September 22, 2011 internist report (R. at 589-595), upon which the ALJ relied in determining Plaintiff's RFC (R. at 72), declares that Plaintiff cannot walk on her heels and toes, her gait is not stable and within normal limits, clinical evidence supports the need for a walking aid, and Plaintiff would fall without aid (R. at 593).  This limitation, Plaintiff argues, precludes light work, which requires the use of both hands and the ability to stand at least 6 hours of an 8 hour work day.  DE 17 at 6.

However, the Court should conclude that the ALJ properly evaluated Plaintiff's fibromyalgia.  First, the ALJ did not rely solely on a lack of objective evidence.  As discussed above, the ALJ's Step 2 discussion of fibromyalgia expressly cited Dr. Wald's May 3, 2011 notes (R. at 478-483) and referred to the October 2, 2012 testimony.  Second, with respect to the actual or differential diagnoses of rheumatologists Yousuf and Raza, a diagnosis of fibromyalgia does not, by itself, establish a severe impairment.  *Higgs,* 880 F.2d at 863.

Third, as pointed out by the Commissioner, the ALJ considered Plaintiff's fibromyalgia at Step 4.  For example, the ALJ referred to the May 3, 2011 notes of Michelle Brewer, which acknowledged a diagnosis of fibromyalgia but indicated a stable clinical impression and an ability to meet her needs in the home (R. at 391-392), and the September 22, 2011 notes of Dr. Nader, which acknowledged the complaint of fibromyalgia, noted "mild pain with pressure to the lumbar area[,]" and apparently acknowledged pain with squatting and arising from squatting  R. at 72, 589-595.

Here, the ALJ limited Plaintiff's ability to do light work in several aspects, including "claimant can stand and walk for approximately two hours each and sit for six hours in an eight-hour workday, with normal breaks[.]"  R. at 69.  Thus, even if the ALJ erred by not concluding that Plaintiff's fibromyalgia was a severe impairment at Step 2, the ALJ took fibromyalgia into consideration at Step 4.  *See*

*Nejat*, 359 F.App'x at 577.  In other words, any error in the ALJ's treatment of Plaintiff's fibromyalgia at Step 2 was rendered harmless by the ALJ's treatment of Plaintiff's fibromyalgia during the determination of Plaintiff's RFC.

### d.   Side effects of medications

At the time of Plaintiff's October 11, 2012 appointment, Andrea Breese, M.D., noted the following active medications:  Zantac®, Lovaza®, trazodone Hcl, Bentyl®, Zestoretic®, Glucophage®, Ultram®, Neurontin®, Mobic®, diclofenac, Flexeril®, Benadryl®, Cymbalta® and marijuana.  R. at 632.  During the October 2, 2012 hearing, Plaintiff testified that her side effects include severe sweating, dizziness, falling and nausea.  R. at 112-114.  Plaintiff contends that these side effects "would adversely affect her ability to hold full time competitive work and [were] overlooked in the ALJ's RFC analysis."  DE 15 at 27.

Defendant contends that Plaintiff did not reference any documentary evidence demonstrating medication side effects.  *See* DE 16 at 20-21; *see also Essary v. Commissioner of Social Sec.*, 114 F.App'x 662, 665-666 (6th Cir. 2004) ("Although Essary testified that she suffered from dizziness and drowsiness as a result of her medications, Essary's medical records make no indication that Essary reported such side effects to any of her physicians. Thus, based on the record before him, the ALJ did not err in finding that Essary suffered no adverse side effects from her medications."); *Hopkins v. Commissioner of Social Security*, 96

24

F.App'x 393, 395 (6th Cir. 2004) ("There was no evidence of side effects that would prevent Hopkins from engaging in gainful activity. Although Hopkins complained of drowsiness, nausea, and blurred vision, these conditions were not documented in the record. Further, the ALJ noted other instances in which Hopkins had not been completely truthful. Credibility determinations rest with the ALJ.") (citing *Siterlet v. Sec'y of Health & Human Servs.,* 823 F.2d 918, 920 (6th Cir.1987)).

However, Plaintiff replies by citing six (6) instances in which she brought her complaints of side effects from medication to the attention of a physician:

- February 25, 2008 notes of Julie A. Kovach, M.D., which document Plaintiff's statement that she experienced severe hip and muscle pain when she took Lipitor® (R. at 437-439)
- April 22, 2008 notes of Sonia Yousuf, M.D., which document a similar complaint with Lipitor® (R. at 460-463)
- October 13, 2010 notes of Andrea Breese, M.D., which document that methadone causes stomach upset and nightmares (R. at 306-309)
- January 12, 2011 notes of Syed Hasan Raza, which indicate that Plaintiff could not tolerate Lyrica® due to nightmares, Neurontin® caused constipation, and Flexeril® caused drowsiness (R. at 401-404)
- February 23, 2011 notes of Deidre Redd, M.D., which document Plaintiff's statement that she is allergic to methadone and reacts to cholesterol-lowering medications (R. at 393-395, 464-466)
- March 21, 2011 notes of Ahmed Zubairi, M.D., which include Plaintiff's complaint that Cymbalta® causes dizziness (R. at 347-350)

*See* DE 17 at 6-7.[15]

Nonetheless, the ALJ expressly represented that he acted in accordance with 20 C.F.R. § 404.1529[16] and SSR 96-7p.  R. at 69.  Moreover, the ALJ relied upon Dr. Redd's February 23, 2011 notes, specifically her attempt to encourage increased activity.  *See* R. at 72, 466.[17]  Furthermore, the ALJ's RFC finding relied upon Plaintiff's October 2, 2012 testimony that she was taking several medications for pain (R. at 70), and her testimony about pain medications and side effects occurred together (see R. at 112-114).  Thus, it follows that the ALJ considered Plaintiff's corresponding testimony about the side effects of sweating, dizziness, falling and nausea in his RFC determination.[18]

### e.        Efforts to obtain pain relief

---

[15] The record also shows Plaintiff refusing a suggested Klonopin® prescription for stress related fibromyalgia; she was "not interested, too many psychoactive medica[ti]ons."  R. at 482.

[16] 20 C.F.R. § 404.1529(c)(3)(iv) ("The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;")

[17] The Undersigned also notes that Dr. Redd did not make changes to Plaintiff's current medication regimen.  R. at 466.

[18] She also testified that her medications kept her from sleeping at night and gave her "running thoughts" and nightmares, but admitted that "nobody has confirmed that." R. at 114.

Plaintiff also argues that the ALJ did not consider Plaintiff's persistent efforts to obtain pain relief as discussed in SSR 96-7p.[19] DE 15 at 29-30.  In particular, Plaintiff appears to refer to the April 8, 2011 notes of Dr. Brewer of Allegiance Physical Medicine and Rehabilitation that Plaintiff found a TENS (transcutaneous electrical nerve stimulation) unit helpful (R. at 467-469, 470-472) and to Dr. Nader's September 22, 2011 notation that clinical evidence supported the need for a walking aid (R. at 593).  Moreover, Plaintiff contends her appointments would take her from work more than the 1 day per month usually allowed.  DE 15 at 30.

However, as the ALJ noted, Plaintiff testified that she sees Dr. Breese at the Center for Family Health approximately every three months when she needs her medications checked or when something else is going on with her (R. at 105-106) and Dr. Brewer also noted she will see Plaintiff back "on as needed basis only[,]" (R. at 467-469, 470-472).  *See* R. at 72.

---

[19] "In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense and persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements. Persistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists, or changing treatment sources may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms." SSR 96-7p, 1996 WL 374186, 7 (July 2, 1996).

Moreover, as the Commissioner points out, the record contains evidence which would support a conclusion that Plaintiff can work on a sustained basis.  DE 16 at 26.  For example, in notes from October 6, 2011 (R. at 596-601), consultative examiners Jeter and Dr. Bray noted, "There is no impairment in the patient's ability to understand simple directions."  R. at 600.  In Dr. Nader's September 22, 2011 supplemental report (R. at 592-593), Plaintiff's current abilities were only limited in the category of "Squat & Arise from Squatting."  R. at 592.  Also, Dr. Nguyen's October 7, 2011 physical RFC assessment (R. at 128-130), which mentions using a cane to reduce pain and prevent falling, also mentions that, taking into consideration her obesity, Plaintiff could perform light work.  Furthermore, Dr. Pinaire's October 17, 2011 mental RFC assessment (R. at 130-132) explained:

> Despite moderate limitations this claimant is able to understand, remember, and carry out simple instructions; make judgments that are commensurate with the functions of unskilled tasks, i.e., work-related decisions; respond appropriately to supervision, coworkers and work situations; and deal with most changes in a routine work setting. There are no significant problems with attention, and there is sufficient concentration to perform simple 1-2 tasks, all on a routine and regular basis.

R. at 132.  The ALJ made clear that he gave some weight to Drs. Pinaire and Nguyen's October 2011 assessments(R. at 120-134).  *See* R. at 71.[20]

---

[20] It seems that Plaintiff intended to put forth the additional sub-argument that "[f]ull limiting effects of two severe mental impairment[s] [were] not considered." DE 15 at 19, 22.  Presumably, this attempted sub-argument was meant to refer to the severe impairments of anxiety disorder and affective disorder.  R. at 66.

## 2.     The ALJ's evaluation of opinion evidence[21]

Within his discussion of the medical evidence, ALJ Jones attributed little

weight to the September 22, 2011 and September 27, 2012 opinions of Eric

Mikelait, L.M.S.W. (R. at 588, R. at 628).  R. at 71.  By way of background,

Mikelait provided outpatient therapy for Plaintiff from October 15, 2010 to

September 27, 2012.  R. at 588, 628.

Despite this period of treatment, the record seems to contain only two (2)

documents from Mikelait.  First, in a letter dated September 22, 2011, Mikelait

wrote to Wendy Shultz (R. at 588), the person who signed the October 17, 2011

disability determination (R. at 134-135).  Second, on September 27, 2012, Mikelait

wrote another letter (R. at 628), seemingly in preparation for the October 2, 2012

hearing.  The ALJ referred to Mikelait's two letters in his opinion, stating:

> In September 22, 2011, Eric Mikelait, LMSW, prepared statements
> concerning claimant, indicating that she [sic] witnessed the decline of
> claimant's emotional and physical functioning with a need for
> inpatient psychiatric care due to the severity of her depression.  Mr.
> Mikelait indicated that claimant's stressor continued with limited
> family help, comfort, or support.  Claimant was often tearful during
> her therapy sessions ([R. at 588, 628]).  As the Social Security rules
> and regulations do not recognize statements made by licensed or
> clinical social workers for the purposes of rendering medical
> diagnoses or opinions, little weight is given to the opinion of Ms.

---

However, while these impairments are mentioned in the initial portions of the brief
(*see* DE 15 at 9, 12, 13, 15 & 18), the brief does not contain substantive argument
in this regard (*see* DE 15 at 22-27).

[21] 20 C.F.R. § 404.1527(e), 20 C.F.R. § 416.927(e).

Mikelait.  Notwithstanding, ***the assessment is not consistent with claimant's medical evidence***, including treatment records, which do not support the degree and level of severity opined by Ms. Mikelait.

DE 71 (emphasis added).

### a.      Mikelait is an "other source"

As an initial matter, the parties agree that Mikelait is not an "acceptable medical source" as contemplated by 20 C.F.R. §§ 404.1513(a), 416.913(a) ("Sources who can provide evidence to establish an impairment.").  *See* DE 16 at 23, DE 17 at 7.  Moreover, as the Commissioner correctly points out (DE 16 at 23), Mikelait, who is a licensed master social worker (LMSW) (R. at 628), is not a "treating source" as defined by 20 C.F.R. § 404.1502, 20 C.F.R. § 416.902 ("Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.").

Instead, Plaintiff contends that Mikelait is an "other source" under 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1).  DE 17 at 7.  "[I]nformation from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 2329939, 2 (Aug. 9, 2006).

### b.      The ALJ appropriately assigned Mikelait's opinion little weight and found it inconsistent with the medical evidence.

Plaintiff argues that the ALJ did not comply with 20 C.F.R. § 404.1527 ("Evaluating Opinion Evidence.") and SSR 06-03p by not according adequate weight to the opinion of Mikelait, and by not considering the length and nature of the treatment relationship.

SSR 06.03p provides, in part:  "Although the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources,' these same factors can be applied to opinion evidence from 'other sources.'  These factors represent basic principles that apply to the consideration of all opinions from medical sources who are not 'acceptable medical sources' as well as from 'other sources,' such as teachers and school counselors, who have seen the individual in their professional capacity.  These factors include:

- How long the source has known and how frequently the source has seen the individual;

- ***How consistent the opinion is with other evidence***;

- The degree to which the source presents relevant evidence to support an opinion;

- How well the source explains the opinion;

- Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

- Any other factors that tend to support or refute the opinion.

SSR 06-03p, 2006 WL 2329939, 4-5 (emphasis added).

Here, the ALJ acknowledged his compliance with SSR 06-03p (R. at 69) and, as noted above, found Mikelait's assessment **inconsistent** with Plaintiff's medical evidence (R. at 71). "Not every factor for weighing opinion evidence will apply in every case. The evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case. Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case." *Id.* at 5. The ALJ's decision states that Mikelait's opinion was afforded little weight and explains why it was so treated. R. at 71.

Moreover, while I acknowledge Plaintiff's statement about her "many visits" with Mikelait (DE 15 at 29), the Court has only seen two (2) entries from Mikelait – the September 22, 2011 letter (R. at 588) and the September 27, 2012 letter (R. at 628) – and not the underlying records. The ALJ cited each of these in his RFC finding. R. at 71.

Also, to the extent Plaintiff argues that the ALJ should have found Plaintiff disabled in light of Mikelait's observations and Plaintiff's testimony about depression and concentration (*see* DE 15 at 29), the ALJ did consider Plaintiff's testimony and noted that she "responded well to treatment" once her "medications were adjusted." *See* R. at 70, 494.

### G.    Conclusion

"[D]uring the first four steps, the claimant has the burden of proof; this burden shifts to the Commissioner only at Step Five." *Walters v. Commissioner of Social Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  It is the claimant's burden to prove his or her RFC.  *See* 20 C.F.R. § 416.912(a); *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001).

Plaintiff has not satisfied her burden to challenge the ALJ's Step 2 or RFC findings.  Thus, from a review of the record as a whole and for the reasons stated above, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary judgment, **DEEM MOOT** Defendant's motion for summary judgment,  **GRANT** Defendant's amended motion for summary judgment, and **AFFIRM** the Commissioner of Social Security's decision.

## III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 932 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.


Dated: July 14, 2015                    s/Anthony P. Patti
                                        Anthony P. Patti
                                        UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing document was sent to parties of record on July 14, 2015, electronically and/or by U.S. Mail

                                        s/ Michael Williams
                                        Case Manager for the
                                        Honorable Anthony P. Patti

34